IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JOANNA CASTRO,
*PLAINTIFF*

V.

Case No. 5:18-CV-312

ALBERT SALINAS,
*DEFENDANT*

**PLAINTIFF'S FIRST AMENDED COMPLAINT
& JURY DEMAND**

**Introduction**

This civil action arises from Defendant's violations of Plaintiff's civil rights on or about February 20, 2018, in Austin, Texas. This action is brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, and the United States Constitution. This is a civil rights action challenging as unconstitutional the above-named Defendant's intentional violation of Plaintiff's First Amendment right to film the police in public, Defendant's retaliation against Plaintiff for exercising her First Amendment rights by filing a false misdemeanor charge against her, and Defendant's excessive force used against Plaintiff. Plaintiff Castro seeks damages from Defendant, in his individual capacity as he acted under color of law, for depriving Plaintiff of her First, Fourth, and Fourteenth Amendment rights under the United States Constitution. Plaintiff also seeks declaratory relief pursuant to 28 U.S.C. §2201 that the Defendant violated rights arising under the Constitution.

1

## Jurisdiction and Venue

1. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331, and §1343. Also, the supplemental jurisdiction of this Court to hear claims arising under any possible state law is invoked pursuant to 28 U.S.C. §1367. Venue in this Court is appropriate under 28 U.S.C. §1391(b).

## Plaintiff

2. Plaintiff Joanna Castro is a resident of Live Oak, Bexar County, Texas.

## Defendant

3. Defendant Albert Salinas, badge number 341 is a police officer with the Olmos Park Police Department and is sued in his individual capacity. He acted under color of law. He has appeared through counsel via a Motion to Dismiss, FRCP 12(b)(6).

## Statement of Facts

4. Joanna Castro films other activists that seek to expose police officer misconduct and constitutional violations. She has filmed several police-citizen encounters to gather information about police departments violating citizens' civil rights. Mrs. Castro films to ensure the safety of the activists that interact with officers. She films, but she does not initiate contact with officers. Mrs. Castro keeps her distance from those encounters so that she *can* film. On February 20, 2018, she was in the City of Olmos Park, Bexar County, Texas, to exercise her First Amendment right to gather information about how Olmos Park treats those who exercise their Second Amendment right to lawfully carry firearms. She carried two cameras. She was not armed.

5. Mrs. Castro filmed Jack Miller, a Second Amendment activist exercising his right to open carry in Olmos Park. She was filming Miller when two Olmos Park Police Department officers

approached Miller, pointing rifles at Miller. Miller himself was not holding any weapon in his hands. He lawfully carried a rifle slung over his chest and back with a sling. His hands were empty.

6. Mrs. Castro was approximately twenty-five feet away from Jack Miller when the Defendant exited his police vehicle, with a rifle in his hands, pointed at Jack Miller. Another Olmos Park officer approached Miller from behind.

7. Defendant shouted at Jack Miller, rifle pointed at Miller. Then, Defendant noticed that Mrs. Castro was filming him. Defendant turned his body away from Jack Miller, and he pointed his rifle at Mrs. Castro. There were approximately six people behind Mrs. Castro when Defendant pointed his rifle in that direction.

8. Immediately, Mrs. Castro backed away from Defendant and backed away from Jack Miller's location. Defendant yelled at Mrs. Castro: "You! Stop that! Put that camera down! Get back! Get back!" Mrs. Castro was backing away from Defendant and Jack Miller the entire time he approached her with his rifle pointed at her, yelling at her to stop filming. Meanwhile, the other Olmos Park officer yelled at Defendant that he should not worry about Mrs. Castro.

9. Defendant closed the distance with Mrs. Castro as she backed away from him. Defendant transferred his rifle from his right hand to his left, and he shoved Mrs. Castro with his right hand, using all his force, his hand landing on her left breast. Mrs. Castro stumbled and almost fell to the ground. Her camera pointed to the ground because of Defendant's use of force. Defendant shoved Mrs. Castro so that her body moved back toward the direction of Jack Miller.

10. Defendant, having failed to knock the cameras out of Mrs. Castro's hands, went after her again. This time, instead of shoving Mrs. Castro, he slapped at her camera, attempting to break the

3

camera, and intentionally prevented Mrs. Castro from focusing her camera on Jack Miller and the other officer.

11.     Defendant turned away from Mrs. Castro without detaining her. Defendant turned his back on Mrs. Castro and walked to Jack Miller and the other Olmos Park officer. He did not look up at Mrs. Castro to see where she was or what she was doing. Mrs. Castro stood approximately the same distance as when Defendant initially approached her and struck her twice, and she then filmed the rest of the Defendant's encounter with Jack Miller.

12.     Jack Miller followed all officers' instructions. He never touched his lawfully carried rifle. And he was arrested without incident.

13.     Mrs. Castro's left breast was bruised as a result of Defendant's hard shove. She learned weeks after that she was charged with the misdemeanor offense of interfering with a police officers, under Texas Penal Code §38.15. She was not detained or arrested for that offense in February 2018. The following is a recitation of Castro's encounter from her perspective, in the first person, with Salinas on February 20th and her subsequent arrest for the misdemeanor offense of interfering with a police officer:

   a. On February 20, 2018, I was in the City of Olmos Park to film the police. I am a back-up camera person for activists who conduct "audits." By the term "audit," I mean that my fellow activists go to a public place to exercise their Constitutional rights to see if the police do their job right and protect the rights of citizens and activists.

   b. I arrived in Olmos Park on February 20th in the evening. I was dropped off on a sidewalk a few blocks from where Defendant Salinas made contact with me. I walked along the sidewalk, talking to Jack Miller, who was the activist exercising his Constitutional rights in this particular audit. Jack also walked along the sidewalk. A few cars passed us as we walked along the sidewalk. I don't believe anyone else was walking on the sidewalk at the same time.

c. At a certain point, Defendant Salinas, whose name I did not know at the time, stopped his patrol vehicle right in the middle of the street, adjacent to where we were walking along the sidewalk area. The official sidewalk on that block is right next to the building with parking spaces located between the public sidewalk and the road. Salinas parked in the middle of the street. When he parked, I was holding both my cellphone and a dedicated camera. The cellphone was on the video recording mode and filming, and my dedicated video camera was also on and filming.

d. I cannot remember if I was on the sidewalk area at the exact moment Salinas got out of his vehicle. I was 10 feet or less from the street, standing on asphalt. There was a parking lot behind me (as Salinas's vehicle was positioned in front of me).

e. Salinas started shouting at me, yelling to get back and to step away, and to put my camera down. With those shouts, I moved away from Jack Miller, obeying the order, walking back and to the side, away from Jack, following Salinas's order. But, I did not follow the order to put down my camera.

f. Salinas came toward me with his rifle pointed toward me, walking fast, almost running. He kept yelling at me. He ordered me to step back and put my camera down. I stepped back, but I did not stop filming.

g. As he was charging toward me, there were people walking in the parking spots within two parking spots of me. The next-door restaurant was busy and open, and I assume that the people in the parking spots near me were patrons of the restaurant. People were sitting at tables on the patio at the restaurant, maybe 30 feet away.

h. He aggressively slapped my cellphone, and then he knocked my dedicated camera with his hand in two separate motions. He was yelling about my camera before he slapped and hit both the cellphone and dedicated camera. Salinas knocked both the cellphone and dedicated camera out of my hands. After he knocked both of the recording devices out of my hands, he left me, turning his back on me, and walked toward Jack Miller.

i. He came after me so forcefully that he hit my shoulder and breast on the left side of my body. From his body language and words, he was aiming for my camera. But, he hit my upper left side. After this, I was sore and tender where he hit me for about a week and a half.

j. Once he knocked the cameras out of my hands, he left me alone entirely. He did not approach me again. He gave no other orders for me to move.

k. Salinas never told me, or ordered me, to stand in any particular place. He just kept saying to get back – and I obeyed each time. He did not order me to move again after he slapped the recording devices out of my hands.

l.  On about the 27th of March 2018, I was again filming police in Olmos Park in roughly the same location. Many activists, maybe a dozen, where present for this audit. Apparently, Salinas got a warrant for my arrest on March 22nd. While I was filming, there were many activists openly carrying firearms as part of the audit. I filmed an activist's arrest.

m.  Two Olmos Park police officers approached me on different occasions, asking if I was Ms. Castro. I was asked about three times if I was Ms. Castro. I did not respond the first two times. I responded the last time, and the officer said he had a warrant for my arrest.

n.  I was arrested about 6:00 p.m. or 7:00 p.m. I was taken to Olmos Police Station, where I sat until about 1:00 a.m. I was shown a picture of myself after the arrest, and I confirmed it was me. My shoes were taken from me as I waited until 1 or 2:00 a.m. They then started to transport me to Bexar County Jail.

o.  When they were ready to transport me, they shackled my ankles, they put extra handcuffs on my wrists. It was raining outside. As I walked out the door, Salinas stopped me and put his hand on my shoulder, as about five other officers watched. Salinas said: "No one has been in my vehicle, so if we find anything – any drugs in my vehicle, they are yours." When he said that, it caused an extreme fear response. It scared the hell out of me that he was going to frame me for something. I was thinking the whole time – what if I wasn't going to make it to Bexar County Jail? What if they were going to pull over?

p.  Two officers were talking among each other at the front of the vehicle, whispering, during the drive. They were within inches of each other in the front seat. I couldn't hear what they said. They were driving slow. I thought they were going to pull over, hurt me, or plant something, or throw something in the back seat to plant on me. I was scared.

q.  We got to the Bexar County Jail, and the two officers left me in the vehicle as they escorted other activists into the jail. They came back, I tried to watch them – again afraid something bad was going to happen. One officer got me out. I was taken inside. Salinas then left. The other officer sat me down and told me not to talk. I was booked into the jail. I was photographed and fingerprinted. I was in the Bexar County jail cell until about 2:00 p.m. the day after my arrest. I received a post card in the mail when I got out of jail stating that I had a warrant out for my arrest for the Salinas-interference charge.

r.  When I talk about Salinas's statement and actions during my arrest, I still have an emotional response, thinking that Salinas could have shot me when he had his rifle pointed at me on February 20th, or planted something on me when he arrested me in March.

s.  I went to court one time for the charge of interfering with a peace officer. During that first and only setting, the charge was dismissed by the prosecution, citing insufficient evidence. The dismissal is attached as Exhibit A, and incorporated herein by reference.

t.  At no time during the encounter with Officer Salinas, did he give me an order that I did not follow, with the sole exception of the order to stop filming him because that is my First Amendment protected right.

## Causes of Action

14. Plaintiff incorporates by reference all the foregoing paragraphs, and asks that insofar as the following theories of liability include additional factual allegations, those allegations be taken as true, and further alleges as follows:

15. The acts and failures of Defendant were unreasonable and were the proximate and producing cause of the injuries and damages suffered by Plaintiff.

16. Defendant intentionally, knowingly, recklessly, or with deliberate indifference to the right of Mrs. Castro caused her to be arrested unreasonably, without an investigation, and without probable cause, violating the Fourth Amendment to the United States Constitution.

17. Defendant intentionally, knowingly, recklessly, or with deliberate indifference to the rights of Mrs. Castro used excessive force when he A) pointed his rifle at Mrs. Castro, B) when he shoved her, and C) when he slapped her, violating the Fourth Amendment. The force was not used for a legitimate law enforcement purpose, but was sadistically used to place Mrs. Castro in fear of imminent serious bodily injury.

18. Defendant intentionally, knowingly, recklessly, or with deliberate indifference to the rights Mrs. Castro used excessive force when he used force without prior verbal command, or after she was subdued and compliant, violating the Fourth Amendment.

19. Defendant intentionally, knowingly, recklessly, or with deliberate indifference to the rights of

Mrs. Castro, violated her First Amendment right to film the police in public by ordering her to stop filming, shoving her to stop her from filming, slapping her camera, and causing her to be arrested in retaliation for exercising her First Amendment protected right to film. *Turner v. Driver*, 848 F.3d 678 (5th Cir. 2017); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011).

20. Defendant intentionally or knowingly committed a common law assault against Mrs. Castro when he placed her in fear of imminent serious bodily injury and/or death when he pointed his rifle at her, when he shoved her with rifle in hand, and when he slapped her camera with rifle in hand. *See Waffle House, Inc. v. Williams*, 313 S.W.3d 796 (Tex. 2010).

## Declaratory Relief

21. Plaintiff realleges the material facts stated in the preceding paragraphs against Defendant. Defendant deprived Plaintiff of her federal constitutional rights to the right to be free from unreasonable searches and seizures and excessive force. Plaintiff asks for a declaration pursuant to 28 U.S.C. §2201 that her First and Fourth Amendment rights arising under the Constitution have been violated by the actions of the Defendant.

## Damages

22. Plaintiff suffered physical injuries in the form of bruising, physical pain, mental anguish and emotional injuries, humiliation, indignity, and special damages incurred or will incur, including but not limited to legal fees, legal expenses, and other related expenses.

## Punitive Damages

23. Defendant is liable for punitive damages as he was consciously indifferent to Plaintiff's constitutional rights.

## Demand for Jury Trial

24. Plaintiff respectfully requests a jury trial.

## Relief

In light of the foregoing, Plaintiff requests Judgment against Defendant as follows:

1. Compensatory damages from the Defendant, in an amount to be determined by the trier of fact;

2. Punitive damages from the Defendant, in an amount to be determined by the trier of fact;

3. Pre-judgment and post-judgment interest;

4. Reasonable costs, expenses, and attorney's fees pursuant to 42 U.S.C §1988(b), expert fees pursuant to 42 U.S.C. §1988(c);

5. A declaration that Defendant violated Plaintiff's Constitutional rights, pursuant to 28 U.S.C. §2201; and

6. All such other relief to which Plaintiff is entitled.

Respectfully Submitted,
PLAINTIFF

By:
 /s/ Millie L. Thompson
Millie L. Thompson
Texas State Bar Number: 24067974
*The Law Office of Millie L. Thompson*
1411 West Ave., Ste. 100
Austin, Texas 78701
Telephone: (512) 293-5800
Fax: (512) 682-8721
Email: millieaustinlaw@gmail.com

## Notice of Electronic Filing

I, Millie Thompson, do hereby certify that on this the 19th day of June 2018, I have electronically submitted for filing, a true and correct copy of the above document in accordance with the Electronic Case Files System of the Western District of Texas.

/s/ *Millie L. Thompson*
Millie Thompson, Plaintiff's Attorney

## Certificate of Service

I, Millie Thompson, do hereby certify that on this the 19th day of June 2018, a true and correct copy of this Plaintiff's First Amended Complaint was served opposing counsel as follows:

Denton Navarro Rocha Bernal & Zech
A professional corporation
2517 N. Main Ave.
San Antonio, Texas 78212
Patrick Bernal
*Via email: Patrick.bernal@rampage-sa.com and by electronic filing.*

/s/ *Millie L. Thompson*
Millie Thompson, Plaintiff's Attorney